IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

UNITED STATES OF AMERICA

VS.                          CRIMINAL NO. 5:06-cr-16(DCB)(JCS)

RICHARD ANTHONY ROBINSON


<u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the Court on the defendant Richard Anthony Robinson's motion to suppress **(docket entry 13)** and motion to re-open suppression hearing **(docket entry 17)**. An initial hearing on the motion to suppress was held on May 30, 2006. The defendant's motion to re-open the hearing was granted and a second hearing was held on August 1, 2006. At the second hearing, the Court requested briefing by counsel and briefing was completed on September 25, 2006. Having carefully considered the evidence, the arguments of counsel, and the applicable law, the Court finds as follows:

Slightly before 4:20 a.m. on March 29, 2006, Warren County Deputy Sheriff Brad Redditt was driving on Interstate 20 near Vicksburg when he noticed an 18-wheel semi-tractor trailer in the right lane "begin to swerve, crossed over into the left lane, back, and ran off the shoulder of the road, ... constantly for several miles." (Transcript of May 30, 2006, Suppression Hearing, p. 15). Redditt decided to stop the truck. He then got out of his vehicle and approached the truck, motioning for the driver to exit his cab.

He explained that he had stopped the truck for swerving and asked for a driver's license.  When asked about his destination, the driver responded that he was going to Texas, but he did not know where in Texas.  He also stated that he was not hauling a load. (Transcript, pp. 15-19).

While Redditt was talking to the driver, he noticed a passenger (the defendant, Richard Anthony Robinson) stand up and move around in the sleeper compartment of the cab.  The driver told Redditt that the man was his cousin.  (Transcript, pp. 20-21). Redditt told the passenger to stay in the cab and called for assistance.  (Transcript, pp. 21-22).  While he was waiting for his backup to arrive, Redditt ran a computer check on the license he had obtained from the driver.  (Transcript, p. 22).  It was a valid Florida driver's license issued to Seymour Thompson.  (Transcript, p. 26).

The first backup to arrive was Deputy Chris Satcher, at approximately 4:30 a.m.  (Transcript, pp. 23, 40).  Deputy John Elfer arrived shortly thereafter.  (Transcript, p. 23).  According to Redditt, Satcher and Elfer questioned the driver and passenger and obtained conflicting stories from them.  The passenger stated that he was not related to Thompson, and stated that their destination was Louisiana, not Texas.  (Transcript, p. 25).  He

also stated that they were looking for a load.[1]  (Transcript, p. 25).  According to Redditt, one of the other deputies, Satcher or Elfer, obtained a driver's license from the passenger.  The computer check showed it to be a valid Florida license issued in the name of Peter Reed.  (Transcript, pp. 25-26).

At some point, one of the deputies, apparently Satcher, asked the driver, Thompson, if he would consent to a search of the truck. (Transcript, p. 27).  Redditt testified that the consent to search was obtained at 4:45 a.m., approximately 25 minutes after the initial stop was made.  (Transcript, p. 30).  As a result of the search, $77,110 in cash and a gun were found in the cab of the truck.  Thompson and the defendant, whom the deputies believed to be Peter Reed, were taken into custody and taken to the sheriff's office for further questioning.  Eventually, the defendant's fingerprints were taken and a computer check was initiated at the sheriff's office.  The computer check revealed the defendant to be Richard Anthony Robinson, an illegal alien, and he was subsequently turned over to federal authorities.

The defendant claims that once the check on his and Thompson's driver's licenses came back clean, the continued detention was illegal and tainted his fingerprints as fruit of the poisonous

---

[1] It is not clear from Redditt's testimony if this last statement was made by both the passenger and the driver (in which case there would be no conflict), or only by the passenger (in which case it would not necessarily be inconsistent with the driver's story).

tree.  Motion to Suppress, ¶ 3.  The government, on the other hand, argues that there was a voluntary consent to search by Thompson, which justified the continued detention and led to discovery of the money and gun, which justified further detention and eventually led to the fingerprint evidence.  Response to Motion to Suppress, ¶ 3.

The legality of a traffic stop under the Fourth Amendment is analyzed using the framework articulated in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).  Under the two-part <u>Terry</u> reasonable suspicion inquiry, the court must determine whether the officer's action was (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place."  <u>Id</u>., at 19-20.  For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle.  <u>See</u> <u>United States v. Breeland</u>, 53 F.3d 100, 102 (5th Cir. 1995).

Here, the defendant does not question the legality of the initial stop for a traffic violation.  He does, however, dispute whether the officers had reasonable suspicion on which to base their subsequent actions which went beyond the scope of the initial stop.  The issue is whether the officers' subsequent actions, including their request to search the vehicle and their continued detention of Thompson and Robinson, were reasonably related to the circumstances that justified the initial stop.  <u>United States v.</u>

Jenson, 462 F.3d 399, 403 (5th Cir. 2006).

In making a reasonable suspicion inquiry, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Cortez, 449 U.S. 411, 417 (1981). Reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. See, e.g., United States v. Santiago, 310 F.3d 336, 340 (5th Cir. 2002). In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. Arvizu, 534 U.S. at 274. However, it is clear that the officer's mere hunch will not suffice. Terry, 392 U.S. at 27. It is also clear that reasonable suspicion need not rise to the level of probable cause. Arvizu, 534 U.S. at 274.

The "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." United States v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004)(en banc). In the course of effectuating the stop, a police officer may permissibly examine the driver's licenses of the occupants and vehicle registration or rental papers and run a computer check on them to investigate whether the occupants have any outstanding

warrants and if the vehicle is stolen. Id. at 508. An officer may also ask the occupants about the purpose and itinerary of their trip. Id. Indeed, the officer's questions need not even be related to the purpose of the traffic stop, since "[d]etention, not questioning, is the evil at which Terry's second prong is aimed." Id.

Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general rule, continued questioning prolongs the detention. Brigham, 382 F.3d at 510; see also Santiago, 310 F.3d at 341–42; United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000); United States v. Dortch, 199 F.3d 193, 200 (5th Cir. 1999), corrected on denial of rehearing, 203 F.3d 883 (5th Cir. 2000). A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. See Brigham, 382 F.3d at 507; United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003); United States v. Jenson, 462 F.3d 399, 404 (5th Cir. 2006). However, mere "uneasy feelings" and inconsistent stories between a driver and passenger do not usually constitute articulable facts that support a reasonable suspicion. See United States v. Estrada, 459 F.3d 627, 631 (5th Cir. 2006).

In this case, Deputy Redditt testified that the driver and passenger gave inconsistent answers to the deputies' questions: the driver claimed the passenger was his cousin, the passenger stated they were not related; the driver stated their destination was in Texas, the passenger said Louisiana.  Redditt testified that he felt it was unusual for an 18-wheeler to be traveling without a load.  (Transcript, p. 20).  He also stated that the driver appeared to be nervous.  (Transcript, p. 20).

In Jenson, the Fifth Circuit found that the government had not shown reasonable suspicion beyond the time it took the license checks to clear; thus, the extended stop was illegal.  The reasons given by the government for the prolonged stop were "(1) It took an unusually long time for Jenson's van to pull over, (2) Jenson's excessive talkativeness indicated nervousness, and (3) Jenson and [his passenger] Cotton appeared to give inconsistent answers."  462 F.3d at 404.  The court disregarded the inconsistent answers because they occurred after "the initial purpose of the stop [had] been fulfilled."  Id.  However, the court also found that the officer could have dispelled his suspicions by asking follow-up questions.  Id. at 404 n.4 (citing Florida v. Royer, 460 U.S. 491, 500 (1983)(explaining that an officer should use "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time")).

The remaining reasons were found by the Fifth Circuit to be

"relatively weak by comparison to the facts in our relevant precedents." <u>Id</u>. at 405 (citing <u>United States v. Jones</u>, 234 F.3d 234, 242 (5th Cir. 2000)(no reasonable suspicion to search vehicle even though one occupant had a previous arrest on a crack cocaine charge); <u>Santiago</u>, 310 F.3d at 338-39 (search unreasonable even though defendant lied to officer about the identity of a passenger)). "More importantly," the court found, "the government [did] not present adequate evidence of a nexus between Jenson's allegedly suspicious behavior and any specific criminal activity." <u>Jenson</u>, 462 Fed.3d at 405. The Fifth Circuit concluded that because the officer "[had] not articulated any particular connection between the allegedly suspicious behavior and drug or weapons possession, beyond the fact the driver's hesitation in pulling over may have been the product of intent to conceal," the government had not shown reasonable suspicion to continue the traffic stop once Jenson's ID cleared. <u>Id</u>. at 406.

In the case at bar, the inconsistency concerning Thompson and Richardson's stated destination, Louisiana or Texas, becomes less glaring if one considers the further explanation that they were "looking for a load." At any rate, the officers apparently did not attempt to dispel their suspicions with further questions. The conflict concerning whether Thompson and Richardson were cousins or not is certainly no more suspicious than the lie about a passenger's identity in <u>Santiago</u>. Similarly, Thompson's

8

nervousness, without more, does not create a reasonable suspicion. The officers failed to articulate reasonable suspicion sufficient to prolong the traffic stop past the time it took to clear the occupants' driver's licenses. See Jenson, 462 F.3d at 406.

The government contends that, even if the officers unreasonably extended the traffic stop beyond the point at which the licenses were cleared, Thompson's consent to search cured any Fourth Amendment problem. "Consent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation." United States v. Chavez-Villarreal, 3 F.3d 124, 127 (5th Cir. 1993); see also Brigham, 382 F.3d at 508 ("a consensual interrogation may follow the end of a valid traffic stop"). In order to determine if consent was validly given, a court asks (1) whether the consent was voluntary, and (2) whether it was an independent act of free will. See Santiago, 310 F.3d at 342 (citing Chavez-Villarreal, 3 F.3d at 127).

To determine whether Thompson's consent was voluntary, the court must consider the following factors: (1) the voluntariness of his custodial status; (2) the presence of coercive police procedures; (3) the extent and level of his cooperation with the police; (4) his awareness of his right to refuse consent; (5) his education and intelligence; and (6) his belief that no incriminating evidence would be found. Jones, 234 F.3d at 242 (citing United States v. Shabazz, 993 F.2d 431, 438 (5th Cir.

1993)).  To determine whether Thompson's consent was an independent act of free will, the court considers "(1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct."  Jones, 234 F.3d at 243.  The government bears the burden of burden of proving both that the consent was voluntary and that it was independent.  Jenson, 462 F.3d at 407-08.

Here, the government has failed to meet its burden.  Redditt's testimony is unclear on this point, but it can be interpreted to indicate that the request to search occurred after Thompson's and the defendant's driver's licenses had cleared.  However, there was no evidence offered that Thompson's license had been returned to him before consent was requested, nor was evidence offered that Thompson had been informed that he was free to go.  See Jones, 234 F.3d at 243 (causal chain had not been broken where officers "appeared to knowingly prolong the detention" by purposely failing to return one of the passenger's ID's).  Even assuming that the consent was voluntary, the government has failed to prove that the consent was an independent act of free will, "which is required when a constitutional violation has preceded the consent."  Jenson, 462 F.3d at 407 n.10.

The Court notes that the evidentiary hearing was not concluded, and further testimony may or may not demonstrate that the consent was both voluntary and independent.  However, the Court

need not pursue this issue with respect to the present motion.  The ultimate issue here is whether Richardson's fingerprints are fruit of the poisonous tree.  This precise issue was addressed in <u>United States v. Lopez-Guerrero</u>, 2000 WL 33348233 (W.D. Tex. Nov. 30, 2000), in which the district court concluded:

> Finally, even if the initial stop was conducted without reasonable suspicion, the arrest without probable cause and any questioning in violation of <u>Miranda</u>, Defendant cannot suppress "identification" evidence.  Simply put, "[t]he body or identity of a defendant in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest."  <u>I,N.S. v. Lopez-Mendoza</u>, 468 U.S. 1032, 1039, 104 S.Ct. 3479, 3484, 82 L.Ed.2d 3479 (1984); <u>see also</u> <u>United States v. Roque-Villanueva</u>, 175 F.3d 345, 346 (5th Cir. 1999)("[E]ven if defendant was illegally stopped, neither his identity nor his INS file are suppressible."); <u>United States v. Pineda-Chinchilla</u>, 712 F.2d 942, 943-44 (5th Cir. 1983)(per curiam). Without question, then, notwithstanding Defendant's stubborn insistence that any identification evidence and corresponding immigration history is a "fruit" of an illegal search, Defendant cannot prevent the Government from introducing the evidence at trial.  Accordingly, to the extent that Defendant asks the Court to suppress any "evidence of name or fingerprint comparisons," the Court is of the opinion that his argument is precluded by the Fifth Circuit case law and should be denied.

<u>Id</u>. at *4.

This Court's reading of the Fifth Circuit cases leads it to a similar conclusion, with one distinction.  Although the Fifth Circuit has held that a defendant's identity and INS file are not suppressible, it has never addressed the admissibility of fingerprint evidence <u>per se</u> in this context in a published

decision.  However, in an unpublished opinion[2], <u>United States v.
Sanchez-Sanchez</u>, 48 F.Appx. 107, 2002 WL 31017673 (5th Cir. Aug. 23,
2002), the court faced the issue in an appeal from a guilty-plea
conviction and sentence by a defendant charged with illegal reentry
following deportation.  The defendant argued, <u>inter alia</u>, that the
district court erred in denying his motion to suppress his
immigration file, his identity, and his fingerprints as a result of
an illegal stop of a vehicle in which he was a passenger.  The
Fifth Circuit ruled that evidence of the defendant's identity,
including his immigration file, was not suppressible.  The court
also affirmed the district court's ruling as to the defendant's
fingerprints, because the fingerprints had been admitted only for
purposes of identification of the defendant.  <u>Id</u>. at *1.

In this case, the officers took Robinson's fingerprints merely
to prove his identity.  The fingerprints are inextricably bound up
with the determination of the defendant's identity, and are meant
to serve no other purpose.  The Court shall therefore take the lead
from the district court in <u>Sanchez-Sanchez</u> and admit the
fingerprints with the understanding that they will be admissible
for no other purpose than to identify the defendant.  Since
Robinson's fingerprints were taken merely for identification
purposes, and not for investigatory purposes, this case is clearly

---

[2] Unpublished Fifth Circuit opinions issued since January 1,
1996, are not precedent, but may nevertheless be persuasive.  Fifth
Circuit Rule 47.5.4.

distinguishable from <u>Davis v. Mississippi</u>, 394 U.S. 721 (1969), and <u>Hayes v. Florida</u>, 470 U.S. 811 (1985).

The defendant's motion to suppress shall therefore be denied. As for his motion to re-open suppression hearing, the motion was granted by the Court, but not entered of record, prior to the August 1, 2006, hearing.  The motion shall therefore be granted. For the reasons set forth herein, however, the Court finds that it is unnecessary to receive further evidence, as the Court's ruling makes the Fourth Amendment <u>Terry</u> issue moot.  Accordingly,

IT IS HEREBY ORDERED that the defendant Richard Anthony Robinson's motion to re-open suppression hearing **(docket entry 17)** is GRANTED for purposes of the suppression hearing held on August 1, 2006, at which time the Court requested briefing.  The Court now finds that no further hearing is required;

FURTHER ORDERED that the defendant's motion to suppress **(docket entry 13)** is DENIED as to his identity, his I.N.S. file, and his fingerprints, with the understanding that the fingerprints will be admissible for no other purpose than to identify the defendant.

SO ORDERED, this the   29th   day of December, 2006.


    s/ David Bramlette
UNITED STATES DISTRICT JUDGE


13